857 F.2d 1575
 Irene C. ROACH, et al., Plaintiffs, Irene C. Roach, as
Mother and Personal Representative of the Estate
of Daniel Clyde Macon, deceased,
Plaintiff-Appellant,
v.
M/V AQUA GRACE, et al., Defendants,
Carras Hellas, Ltd., as Owner of the M/V Aqua Grace, Sea
Scrub Systems, Inc., a Florida corporation, and
Robin Lamaire, as owner of Sea Scrub
Systems, Inc., Defendants-Appellees.
 No. 87-3118.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 26, 1988.
 
 1
 George Kickliter, Hendrik Uiterwyk, Edward Gerace, Tampa, Fla., for plaintiff-appellant.
 
 
 2
 Carl Nelson, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., for Hallas & Seagroup.
 
 
 3
 William John Beer, Pontiac, Mich., for Sea Scrub Systems.
 
 
 4
 Appeal from the United States District Court for the Middle District of Florida, Tampa Division.
 
 
 5
 Before HILL and EDMONSON, Circuit Judges and ARONOVITZ*, District Judge.
 
 ARONOVITZ, District Judge:
 
 6
 This is an appeal from an order entering final summary judgment in favor of the remaining defendant and against the plaintiff in this action. We affirm.
 
 Facts
 
 7
 In early 1984, Sea Scrub Systems, Inc. contracted with Carras Hellas, Ltd., owner of the M/V Aqua Grace, for the underwater hull cleaning of that merchant vessel at Tampa, Florida. Daniel Clyde Macon, an uncertified and inexperienced diver, was hired sight-unseen after a telephone interview with Robin Lamaire, the president and sole shareholder of Sea Scrub, as one of several divers to scrape the barnacles from the Panamanian flag but Greek-owned vessel. The Aqua Grace had been docked in Tampa Bay since September 6, 1983, and the hull cleaning operation was among the several jobs commissioned by one Elias Tsarnas, a retired employee of the vessel, to accomplish the reactivation of the vessel after lay-up status.
 
 
 8
 On March 4, 1984, Lamaire and nine divers employed by Sea Scrub, Macon among them, arrived at the dock of Atlantic Sandblasting & Coatings, Inc., where the Aqua Grace was docked. Because of the shallow water at the point where the vessel was docked, and the resulting limitations on underwater access to the hull, the cleaning operation had been arranged in two stages: the Sea Scrub employees were to scrape the bow and stern of the Aqua Grace and the port side, but not the flat part of the hull between the number 1 and 7 hatches. The remaining portion of the hull, including the bottom, was to have been scraped in deep water at the inner harbor anchorage. In addition to the shallowness of the water, maneuverability at the underwater situs of the diving operation was limited by the mooring of a second vessel alongside the Aqua Grace. Visibility into the water from the surface was eighteen inches to two feet, due to the muddy condition of the slip.
 
 
 9
 The diving operation commenced from shore in the early morning. Macon was instructed by Lamaire to clean the accessible portions of the Aqua Grace, including the entire port side, which was resting on the bottom. Macon did not use a safety line; nor did the other divers. Macon completed three dives that morning without incident. A fourth dive commenced at about 11:45 a.m., and Macon should have surfaced at about 12:45 p.m. He did not. Lamaire's divers conducted an underwater search for Macon, and around 2:00 p.m. Lamaire boarded the Aqua Grace to inform Captain Boutsis that a diver had not surfaced within the time his scuba tank would have permitted him to breathe under water. At 3:05 p.m. Macon's body was found beneath the vessel's bilge keel, half buried in mud under 17 feet of water. Following the accident, it developed that Sea Scrub had not secured the compensation insurance required by the Longshore and Harbor Workers' Compensation Act (hereafter "LHWCA" or "Act").
 
 
 10
 Suit was subsequently brought against numerous defendants by Irene Roach, the decedent's mother and personal representative of the decedent's estate, in the United States District Court for the Middle District of Florida. The defendants named in the amended complaint were the M/V Aqua Grace; Carras Hellas, Ltd., the vessel's owner; Seagroup, Inc., an alleged agent of the M/V Aqua Grace; Atlantic Sandblasting & Coating, Inc., lessee of the dock where the vessel was moored; United States Fidelity and Guaranty Company and Maryland Casualty Company, insurers of Atlantic Sandblasting; Sea Scrub Systems, Inc.; and Robin Lamaire. The vessel was never arrested so that it never came within the jurisdiction of the District Court. The lawsuit was dismissed by stipulation as to Seagroup, Inc. and upon motion of Mrs. Roach as to Sea Scrub and Lamaire. All claims against Atlantic Sandblasting and its insurers have been settled. Consequently, the only defendant remaining in this lawsuit is Carras Hellas, Ltd.
 
 
 11
 The District Court granted summary judgment in favor of Carras Hellas, Ltd. on all counts in the amended complaint. Roach v. The M/V Aqua Grace, No. 85-1223-Civ-T-13 (M.D.Fla. Jan. 16, 1987). The lower court found that the decedent was not a seaman and was not an employee of Carras Hellas, so that no claim could be stated under the Jones Act, 46 U.S.C.App. Section 688 (1982)[1]. Rather, the decedent was determined to be a harbor worker within the meaning of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Section 901 et seq. In determining what duties Carras Hellas owed to Daniel Macon under Section 5 of the Act, 33 U.S.C. Section 905, the district court applied the standard set forth in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The court found that Carras Hellas had met its Scindia obligation to turn over the ship in a safe condition, and that neither the defendant nor its agents had knowledge of unreasonable dangers presented to the divers once the operation was under way, so that no duty had arisen to intervene on behalf of Macon. The remaining claims were held inapplicable to Carras Hellas since they were based on violations of regulations promulgated by the Occupational Safety and Health Administration, and on the absence of workmen's compensation insurance, both of which were the sole responsibility of Sea Scrub as employer.
 
 
 12
 Irene Roach appeals the decision of the district court on several grounds. The appellant contends that the district court erred by resolving material factual disputes and disputes concerning the inferences to be drawn from material facts in entering summary judgment for Carras Hellas. Specifically, Mrs. Roach contends that the employment status of Macon vis a vis Carras Hellas was a disputed question of fact, and that if Carras Hellas were determined to be a contractor, it could be liable under 33 U.S.C. Section 905(a), for Sea Scrub's failure to obtain compensation insurance. Appellant also contends that the lower court improperly resolved factual disputes in determining that Carras Hellas had met its Scindia duties. In the alternative, appellant takes the position that the Scindia formulation of the duties owed by a vessel owner under Section 905(b) is not supportable in such a situation. Finally, the appellant suggests that the Court apply Section 413 of the Restatement (Second) of Torts so as to deny Carras Hellas any "independent contractor" defense against liability for Macon's death. We will address these arguments in turn.Macon's Employment Status
 
 
 13
 It is beyond question that Macon was an employee of Sea Scrub within the meaning of the LHWCA. 33 U.S.C. Section 902(3) states that "The term 'employee' means any person engaged in maritime employment, including ... any harbor-worker including a ship repairman, shipbuilder, and shipbreaker ...." Macon was commissioned to scrape barnacles from the hull of a vessel--an activity constituting maintenance if it is not in fact repair--and so falls within this definition. C.f. Hite v. Maritime Overseas Corp., 375 F.Supp. 233 (D.Tex.1974). Section 902(4) defines "employer" as "an employer any of whose employees are employed in maritime employment, in whole or in part ...." This tautological definition is important because it limits the class of persons required to maintain compensation insurance under the Act. 33 U.S.C. Section 904 (1982).
 
 
 14
 Appellant Roach argues strenuously that under Section 905(a), Carras Hellas could become the substituted employer if it or its agent Tsarnas acted as a contractor. In particular, the appellant relies on the last sentence of Section 905(a) which states that "For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title." Appellant submits that this section requires a factual determination as to whether Carras Hellas is a contractor, since it hired a "subcontractor" who did not have compensation insurance coverage.[2]
 
 
 15
 Appellant's argument is closely related to the "dual capacity" doctrine invoked in worker's compensation cases. The dual capacity doctrine creates common law and/or statutory liability on the part of an employer who normally enjoys immunity under the exclusive remedy provisions of worker's compensation laws, when the employer acts in a capacity outside the employer-employee relationship. Lowe v. Chemical Sealing Corp., 535 F.Supp. 1280, 1281 (N.D.Ga.1982). The Supreme Court applied this principle to employers under the LHWCA in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). There, a longshoreman employed directly by a vessel owner was allowed to maintain a negligence action under Section 905(b). Although the longshoreman had received compensation payments, the Supreme Court reasoned that the exclusive remedy provision of Section 905(a) was undermined by the specific allowance under 905(b) of an action against the shipowner.
 
 
 16
 The result in Jones & Laughlin Steel Corp. has been contained legislatively by the 1984 amendments to the LHWCA, which revised the third sentence of Section 905(b) to read as follows:
 
 
 17
 If [a claimant under the Act] was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action [for negligence] shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.
 
 
 18
 While this amendment does not disturb the holding of Jones & Laughlin Steel Corp., it does indicate a Congressional intent to limit invokation of the dual capacity doctrine under the Act. See H.R.Conf.Rep. 1027, 98th Cong., 2d Sess. 23, reprinted in U.S.Code Cong. & Admin.News 2734, 2771, 2773 (1984).
 
 
 19
 Appellant nonetheless asks the Court to recognize the purported dual capacity of Carras Hellas in relation to the decedent. Given the finely balanced liabilities Congress has established in the LHWCA, and the Congressional limitation placed on the dual capacity of vessel owners by the 1984 amendments, it would require clear evidence that an owner had adopted some additional capacity before a Court would be justified in imposing liability independent of Section 905(b). There is no concern in the present case, as there was in Jones & Laughlin Steel Corp., that a legislatively established liability will be circumvented because of fortuitous employment circumstances. To the contrary, the recognition that a shipowner has adopted the role of being its own general contractor--a coincidence of roles which is counterintuitive at best--would place the shipowner in a liability posture reserved by Congress for parties in an employment relationship with the injured worker. For these many reasons, the Court feels restrained by the oft-invoked condition of dual liability that in order to impose liability independent of a statutorily described role, the alleged tortfeasor must possess a second persona so completely distinct from and unrelated to his apparent status that by established standards the law recognizes it as a separate legal entity. Wright v. United States, 717 F.2d 254 (6th Cir.1983). See also 2A Larson, Workmen's Compensation Law 14-229 (1982), and cases annotated therein.
 
 
 20
 The term "contractor" is not defined by the LHWCA. Neither party has identified a case defining the term "contractor" or "general contractor" in the maritime (or any other) area under federal common law. A preliminary question to be resolved, then, is what state law, if any, should be applied to determine the status of Carras Hellas, Ltd. in relation to the decedent Macon.
 
 
 21
 Congress has legislatively established the applicability of an adjacent state's law to actions arising on the outer continental shelf, 43 U.S.C. Section 1333(a)(2). Through this provision, adjacent state law has been applied to determine general contractor status for purposes of the LHWCA. Meadows v. Dickson Welding, Inc., 593 F.Supp. 1320, 1322 (E.D.La.1984). While Section 1333(a)(2) is not directly applicable to the present case, the Congressional sanctioning of the use of diverse state decisional law in a closely related area suggests that there is no compelling need for a uniform federal rule. C.f. Pankow Construction Co. v. Advance Mortgage Corp., 618 F.2d 611, 613 (9th Cir.1980). The Court therefore deems it appropriate to apply Florida law in determining the general contractor status of Carras Hellas.[3]
 
 
 22
 Under Florida law, a general contractor is one who has a contractual obligation, a portion of which he sublets to another. Richardson v. United States, 577 F.2d 133, 135-136 (10th Cir.1978), quoting Jones v. Florida Power Corp., 72 So.2d 285, 289 (Fla.1954). Clearly, Carras Hellas, Inc. was under no contractual obligation to undertake repairs of its own vessel. Nor could such an obligation be ascribed to it through Mr. Tsarnas. The uncontradicted evidence in the record is that Tsarnas commissioned various jobs as an "accomodation" to his former employer, without compensation. Facially, no enforceable contract existed between Tsarnas and Carras Hellas. Moreover, the existence of a contractual obligation to Carras Hellas would only serve to establish the liability of Tsarnas as an independent general contractor. Because Mr. Tsarnas is not a party to this lawsuit, we need not consider his possible liability under such a theory.
 
 
 23
 Equally important is the fact that no action taken by Carras Hellas, or an agent acting on its behalf, is distinguishable from the actions an interested owner would be expected to take in commissioning the reactivation of a vessel. Mr. Tsarnas arranged for several repair and maintenance operations to be performed on the M/V Aqua Grace. Concerning the hull scraping, Mr. Tsarnas arranged for the operation to take place in two stages, since conditions at the dock did not permit access to all parts of the hull. In addition, he was careful to employ a contractor which would use the proper equipment to accomplish the hull scraping. We are unable to say that these actions are clearly distinct from the actions that a responsible vessel owner would take to preserve his property and livelihood.
 
 
 24
 Thus, we are unable to find even scant evidence that Carras Hellas possessed a distinct persona, independent of its status as vessel owner, under clearly identifiable legal standards. Accordingly, there is no basis for imposing dual owner-contractor liability. The trial court's failure to state explicitly the absence of evidence on this point does not require that the case be remanded.[4]
 
 Application of Section 905(b)
 
 25
 A harbor worker whose injury is caused by the negligence of a vessel, or such harbor worker's personal representative, may bring an action against the vessel under 33 U.S.C. Section 905(b).[5] Appellant Roach's action against Carras Hellas, Ltd. is squarely within the coverage of this section. Because we agree with the district court's application of Section 905(b), we discuss its interpretation only briefly.[6]
 
 
 26
 The duty a shipowner owes a longshoreman under Section 905(b) was set forth in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Before a stevedore begins work, a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know. Scindia, 451 U.S. at 166-167, 101 S.Ct. at 1621-1622. In the ordinary case, the shipowner may rely on the stevedore to perform its work with reasonable care, and there is no duty to supervise the stevedore "absent contract provision, positive law, or custom to the contrary." 451 U.S. at 172, 101 S.Ct. at 1624. The shipowner must intervene only when it becomes aware that the ship, its equipment or gear poses a danger to the stevedore and is also aware that the stevedore is acting unreasonably to protect the longshoreman. 451 U.S. at 178, 101 S.Ct. at 1627.
 
 
 27
 The Scindia standard is applicable to the employment of independent harbor contractors and their maritime employees, Hill v. Texaco, Inc., 674 F.2d 447, 450-51 (5th Cir.1982). It has been held applicable to harbor workers performing underwater, as well as on board, repairs. Casaceli v. Martech International, Inc., 774 F.2d 1322 (5th Cir.1985).
 
 
 28
 The district court determined that there was insufficient evidence contained in the record to raise any genuine material factual issues of negligence by Carras Hellas. The court found no evidence to suggest that Carras Hellas had breached its initial duty to turn over the ship and its gear in a condition which would allow Sea Scrub to proceed with reasonable safety. Furthermore, because knowledge of the actual underwater condition of the slip was attributable to the divers, Casaceli, 774 F.2d at 1329, 1331, and because there was deposition testimony that Sea Scrub did in fact possess such knowledge, the lower court concluded that there was no duty to warn under the circumstances. In determining whether a duty to intervene had arisen under the facts of this case, the district court was guided by the factors identified in Casaceli:
 
 
 29
 whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned or controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.
 
 
 30
 774 F.2d at 1328, citing Futo v. Lykes Bros., S.S. Co., 742 F.2d 209, 218, 221 (5th Cir.1984). The district court found no evidence to indicate that either the captain of the vessel or its skeleton crew had knowledge or expertise in underwater diving operations; and none of the crew members aboard the vessel had knowledge of the danger posed by the diving conditions. There was no evidence that the decedent had made any complaint to the ship or its crew concerning the diving operation. The district court therefore concluded that Carras Hellas had breached no duty to intervene.
 
 
 31
 In reviewing the grant of summary judgment, the Court must apply the same standard as that governing the district court's decision: that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Riberglass, Inc. v. Techni-Glass Industries, Inc., 804 F.2d 1577, 1580 (11th Cir.1986); Fed.R.Civ.P. 56(c). The language of Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 106 S.Ct. at 2552-2553. Of course, in evaluating a motion for summary judgment, the inferences to be drawn from the underlying facts contained in the materials presented to the court must be viewed in the light most favorable to the party opposing the motion, U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and the allegations of the nonmoving party are taken as true. E.C. Ernst, Inc. v. General Motors Corp., 537 F.2d 105, 108 (5th Cir.1976). After a thorough review of the record in this case, and upon application of the aforedescribed standard, we are unable to disagree with the district court's decision.
 
 
 32
 Appellant Roach contends that the district court erroneously decided material factual disputes in connection with the duties owed by Carras Hellas under Scindia. Specifically, appellant objects to the reliance allegedly placed on the deposition testimony of Robin Lamaire in determining that Macon had knowledge of the dangerous diving conditions at the dock. However, the district court correctly ruled that as a matter of law, knowledge of the underwater condition of the slip and the risks inherent in those conditions are properly attributable to the divers performing a cleaning operation, and that the shipowner therefore had no duty to warn. Moreover, Macon had already made three dives that day, so that the district court need not have relied on the testimony of Lamaire to conclude that Macon was aware of the underwater conditions.
 
 
 33
 Appellant also assigns error to the district court's reliance on the deposition testimony of Mr. Tsarnas. Appellant objects to the consideration of the testimony of an interested party, and claims that a credibility issue as to Carras Hellas' knowledge of the dangerous conditions at the slip required submission to the jury. We have already determined that Carras Hellas had no duty to warn Sea Scrub or its divers of dangerous conditions entirely within their underwater domain. The additional dangers arising from the adjacent mooring of the vessels were not hidden dangers known by Mr. Tsarnas alone, but were obvious to both parties. Accepting as true appellant's contention that Mr. Tsarnas knew of the dangers inherent in the diving operation, it would not follow that he breached a duty to warn, since there is no indication whatsoever that he had exclusive knowledge of these dangers.
 
 
 34
 As an alternative to her position that the trial court impermissibly resolved factual disputes in applying the Scindia standards, appellant asserts that the Scindia decision is inapplicable. Appellant observes that Scindia was premised on the assumption that the stevedore or other maritime contractor to whom the vessel is entrusted is an expert upon whom the vessel owner is entitled to rely. Scindia, 451 U.S. at 167, 101 S.Ct. at 1622; Hill v. Texaco, Inc., 674 F.2d at 447. Therefore, appellant argues, the decision should not apply where the maritime contractor was incompetent and where the vessel owner knew or had reason to know of such incompetence. While this argument does have some appeal, such a case is not presented on these facts, since Carras Hellas had no reason to suspect the incompetence of Sea Scrub. Sea Scrub was recommended to Mr. Tsarnas by another commercial diving outfit as being equipped and qualified to undertake the hull scraping. Tsarnas met with Lamaire and received a brochure as well as verbal assurances of Sea Scrub's competence and even expertise. In the absence of affirmative evidence to the contrary, an owner is entitled to rely on the representation of a marine contractor that it is qualified to execute the task for which it is engaged.
 
 
 35
 Finally, appellant Roach urges the Court to adopt Section 413 of the Restatement (Second) of Torts, and to apply that provision as a basis for liability in the instant case. Section 413 outlines the general duty of one who employs an independent contractor to do work involving an unreasonable risk of physical harm to others. To the extent that the section may be read to cover the employees of independent maritime contractors, its application would conflict with the standards set forth in the Scindia decision. This Court does not have the power to abandon controlling Supreme Court precedent in favor of the Restatement.
 
 Conclusion
 
 36
 The facts of this case are tragic, and it is unfortunate that the estate of the decedent will not receive the compensation to which it is entitled under the law. However, the Court refuses to extend liability to a blameless party to accommodate the circumstance that the negligent parties are impecunious. Because the record, viewed in the light most favorable to the nonmoving party, reveals no material factual dispute, and because the district court correctly applied the law applicable to this case, the grant of summary judgment in favor of Carras Hellas, Ltd. is AFFIRMED.
 
 
 
 *
 Honorable Sidney M. Aronovitz District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 This determination has not been contested on appeal, and appellant's argument to the contrary has thus been abandoned. Harris v. Plastics Manufacturing Co., 617 F.2d 438, 440 (5th Cir.1980)
 
 
 [2]
 We do not agree that Section 905(a) speaks to the issue of shipowner liability. The language alluded to by the appellant was added by a 1984 amendment to the LHWCA which was specifically intended to overrule the Supreme Court decision in Washington Metropolitan Area Transit Authority v. Johnson, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). That decision had allowed contractors to purchase wrap-around insurance policies on behalf of their subcontractors, and claim the immunity from additional liability which is the quid pro quo of worker's compensation. See West v. Kerr-McGee Corp., 765 F.2d 526, 529 (5th Cir.1985). The 1984 amendment limits the cases in which a contractor may escape full liability to instances in which a subcontractor has affirmatively defaulted on its statutory obligation to obtain insurance, and the contractor has, in accordance with the statutory scheme, acted as a secondary or guarantee insurer. Id. Thus, the phrase "for purposes of this subsection" refers to the subsection's primary purpose of establishing exclusive liability in the way of compensation insurance, and not to the subsection's secondary purpose of allowing a choice between sueing for compensation or for damages when insurance has not been provided. Because Carras Hellas has not claimed any immunity under Section 905(a), that provision is irrelevant to this appeal
 
 
 [3]
 See also Lowe v. United States Smelting, Refining & Mining Co., 176 F.2d 813 (9th Cir.1949) (application of a federal statute may depend on the determination of a party's status under state law)
 
 
 [4]
 The Court is similarly unpersuaded by the appellant's argument that shipowners, because they are in the best position to determine whether a contractor carries the statutorily required insurance, should be held liable in tort for the negligence of their uninsured contractors. While it may often be the case that shipowners can determine the regulatory compliance of their contractors, Congress has directly addressed the responsibility of shipowner's to enforce the LHWCA's insurance requirements. 33 U.S.C. Section 937 subjects vessel or hull owners to the possibility of a fine or imprisonment for failure to obtain a certificate of compliance from a stevedore. The Court sees no basis for imposing additional private liability in addition to the criminal and private liability established by Congress. The liability imposed on general contractors for failure of their subcontractors to obtain insurance, 33 U.S.C. Section 904, illustrates that Congress was concerned not with the possibility that shipowners would externalize the cost of their operations by hiring uninsured contractors, but that contractors would externalize the cost of their statutory duty by hiring uninsured subcontractors
 
 
 [5]
 Section 905(b) provides that:
 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party ....
 
 
 [6]
 Appellant contends preliminarily that Section 905(b) should not be applied to bar an action against a vessel owner for breach of a warranty of seaworthiness, when the vessel owner has hired an uninsured contractor. This contention is meritless