[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11833
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 22, 2011
JOHN LEY
CLERK

D.C. Docket No. 3:07-cv-00638-MMH-MCR

JOEL W. GREEN,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

No. 10-11975
Non-Argument Calendar

_____

D.C. Docket No. 3:07-cv-00638-MMH-MCR

JOEL W. GREEN,

Plaintiff,

NORTH FLORIDA SHIPYARD, INC.,

AMERICAN LONGSHORE MUTUAL ASSOCIATION, LTD.,

Intervenor-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 22, 2011)

Before BARKETT, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Joel Green, North Florida Shipyard, Inc., and American Longshore Mutual Association, Ltd., (collectively "Green"), appeal the judgment against Green's complaint under the Longshore and Harbor Workers' Compensation Act. 33 U.S.C. § 905(b). Green, an employee of North Florida Shipyard, Inc., was burned when a spark used to light his cutting torch ignited gas that had accumulated in the starboard aft peak ballast tank of the M/V Cape Edmont, a ship owned by the United States. Green complained that the United States, acting through Clyde Roberts, had failed to ventilate Green's work space adequately to dispel gas that

2

had leaked from his cutting torch. Following a bench trial, the district court found that Roberts was not an agent or a subagent of the United States and concluded that the United States, as a shipowner, did not owe any duty to protect Green. We conclude that the findings of the district court are not clearly erroneous, and we agree that the United States owed no duty to Green. We affirm the judgment in favor of the United States.

## I. BACKGROUND

The United States Maritime Administration owned the Cape Edmont, but the Administration contracted with Marine Transport Lines, Inc., to manage, maintain, and repair the ship. While the Cape Edmont was undergoing repairs at the Dentyens Shipyard, the United States Coast Guard inspected the ship and discovered that the steel in its starboard and port aft peak ballast tanks were below the minimal allowable thickness required by the American Bureau of Shipping. Marine Transport was required to replace the steel for the Cape Edmont to retain its class certification.

Marine Transport requested bids for the steel renewal project and awarded the contract to North Florida Shipyard. North Florida Shipyard agreed to furnish the labor, materials, and equipment necessary to repair the ballast tanks, including the equipment required to ventilate the areas where steel cutters and welders

would be performing "hot work" with fire- or spark-producing tools. The project required that North Florida Shipyard provide mechanical fans and air socks that, using a combination of positive and negative ventilation, removed smoke, welding fumes, and other noxious gases from the work areas. North Florida Shipyard also agreed to retain both a marine chemist to certify that all areas involving hot work had safe levels of gases and a "competent person" to daily test and inspect the work areas.

Marine Transport did not use any of its personnel to supervise the steel renewal project. Instead, Marine Transport hired Clyde Roberts, a ship repair expert, as the Special Port Engineer to oversee the project. Marine Transport agreed to pay Roberts according to invoices he submitted from his company, Independent Marine Consultants, Inc. The Maritime Administration did not reimburse Marine Transport for Roberts's expenses, nor did the Administration have any contact with Roberts. Instead, Roberts reported to the president and CEO of Marine Transport, Ernie Otterspoor. Marine Transport and Roberts agreed orally that Roberts could not bind Marine Transport to payment, but that Roberts could negotiate change orders and field bids for the project.

Roberts inspected daily the work performed by North Florida Shipyard. Roberts "physically crawled into the various work spaces, visiting each work

space on average between six to fifteen times per day." Roberts ensured that North Florida Shipyard met its deadlines and complied with technical specifications. Roberts signed, as "ship personnel," one certificate stating that North Florida Shipyard had completed forty percent of the necessary repairs to the aft peak tank. Roberts also signed, as "owner's representative," several inspection reports approving specific welding tasks and one handwritten document approving painting performed by North Florida Shipyard.

Marine Transport did not require that Roberts manage the safety procedures of the steel renewal project, but Marine Transport expected Roberts to report to North Florida Shipyard any safety hazards that he noticed. Marine Transport gave Roberts the authority to stop work on the project if he noticed that working conditions were unsafe, and Roberts involved himself in safety protocol for the project. He met with the chief engineer of Marine Transport to improve the quality and quantity of fire watch stations, and Roberts gave the supervisor of North Florida Shipyard a card about specific safety procedures. Roberts requested that North Florida Shipyard follow a safety protocol in which its cutters and welders, at every break and the end of work shifts, would turn off the gas source at the manifold, disconnect gas lines from the gas source, and remove gas lines and torches from the work spaces below deck. A supervisor of North Florida Shipyard

5

testified that it did not require its employees to comply with Roberts's suggested protocol. Employees of North Florida Shipyard were required at breaks to turn off the gas source and disconnect gas lines, but employees did not remove their torches from work spaces until the end of their shift.

North Florida Shipyard hired David Miller, a marine chemist, to inspect the areas of the Cape Edmont where hot work would be conducted. The morning of January 17, 2006, Miller certified that the atmospheric conditions below deck complied with federal regulations and were safe for hot work and, later that day, North Florida Shipyard began hot work inside the ship. Beginning on January 18, 2006, a "competent person" from either Miller's company or North Florida Shipyard inspected the atmospheric conditions inside the ship daily while the steel cutters and welders were working.

North Florida Shipyard assigned Green, a first class shipfitter, to remove wasted steel in the starboard aft peak ballast tank. Around January 20, 2006, Green and Paul Degrove began cutting the metal, and the undertaking took several days. The testimonies of Green and Degrove differed about when North Florida Shipyard installed a ventilation system and the level of ventilation in the tank, but both men testified that they received proper ventilation equipment eventually. When the men completed the cutting process, Degrove was replaced by Mary

6

Chamberlain, who tacked to the ballast tank pieces of replacement steel.

Green gave conflicting statements about the ventilation during the tacking process, and his statements were inconsistent with the testimonies of Chamberlain and people who inspected the starboard aft peak tank. Green first testified that Degrove removed the ventilation system when he left the tank, but Green later testified that, after Degrove left, air socks that were inoperative or not attached to a fan were placed in the tank to mislead inspectors about ventilation in the tank. Chamberlain testified that she observed proper ventilation in the tank during the tacking process. Roberts, Green's supervisors at North Florida Shipyard, and Miller all testified that they observed what they believed to be adequate ventilation in the tank.

Green testified that he complained to various persons about the lack of ventilation, but Green did not complain to Roberts or to any representative of Marine Transport. Green referred to Roberts as a "ghost" during the steel renewal project, and employees and crew members of Cape Edmont who remained on board the ship during the repairs testified that Green did not complain to them about the ventilation of the starboard aft peak tank. Green testified that he complained to two of his supervisors at North Florida Shipyard and to an individual wearing a white uniform who was not an employee of North Florida

Shipyard but who was responsible for certifying the tank for hot work. Green did not dispute evidence that employees of Marine Transport did not wear white uniforms.

Green used his own cutting torch while working in the starboard aft peak tank. Over time, cutting torches are known to leak flammable gases, which can cause the torch to ignite although the torch is turned off. Green knew his torch had a leak, and Chamberlain and Green observed his torch light while it was turned off. Green addressed the problem by tightening the gas knob on his torch when he could, but failed to have the torch repaired or obtain a temporary torch from North Florida Shipyard. Chamberlain testified that she did not report the safety hazard to her supervisors.

On January 26, 2006, the "competent person" for North Florida Shipyard inspected the starboard aft peak tank and certified that the area was safe for "hot work." Green testified that there was no ventilation in the tank, but his testimony conflicted with that of his expert, who testified there was ventilation, albeit inadequate, in the tank. Green's testimony also conflicted with testimony from Chamberlain and employees of North Florida Shipyard, who testified that the tank had both positive and negative ventilation, and with evidence that burnt remnants of positive and negative air socks were found in the tank.

That afternoon, North Florida Shipyard allowed their employees to leave the Cape Edmont to cash their paychecks. When Green left, he turned off his cutting torch, but he did not disconnect his torch from the gas source or turn off the gas source at the manifold. While Green was away, his torch leaked both oxygen and chemolene into the starboard aft peak tank, and the dense gases pooled along the floor of the tank. During the break, Roberts spoke with a supervisor of North Florida Shipyard and the two men walked within ten or fifteen feet of the gas manifold.

Green returned to Cape Edmont and, contrary to established safety policy, entered the starboard aft peak tank to work alone. Before he donned his protective gloves, Green opened the gas valve on his torch and attempted to light the torch with his striker. The spark ignited the gas that had pooled in the floor of the tank and caused a flash fire. Green escaped the tank, but he incurred severe burns.

A few hours later, North Florida Shipyard summoned Miller to inspect the ship. Miller examined all the areas involving hot work. Around 6:50 p.m., Miller certified that the atmospheric conditions in the starboard aft peak tank were safe to resume hot work.

After a trial without a jury, the district court entered judgment in favor of the United States and issued a thorough opinion containing its findings of fact and

9

conclusions of law. Before it addressed what duty, if any, the United States owed

Green, the district court found that "Roberts was an independent contractor, not an

employee," of Marine Transport. The district court found that Green, who was

"focusing on the relationship between Roberts and [Marine Transport]," had

"failed to offer any evidence of a direct agency relationship between Roberts and

the United States" or that Marine Transport had "actual or apparent" authority to

appoint Roberts as a subagent of the United States. The district court ruled, after

"[d]iscounting any conduct by Roberts," that Green failed to establish any "basis

for imposing the active operations duty on" the United States because North

Florida Shipyard controlled the starboard aft peak tank, Green's work, and the

ventilation system. The district court also ruled that Green "failed to satisfy the

basic conditions required for imposing a duty to intervene on" the United States in

the absence of "actual knowledge of any hazards in the tank" and the fact that "any

hazardous conditions were created entirely by [North Florida Shipyard] and its

employees" and the "leaking torch and pooled gas[] were transitory[] and actually

known by" Green.

## II. STANDARDS OF REVIEW

This appeal is governed by two standards of review. "[T]he existence of an

agency relationship is a question of fact," and related findings are "binding unless

10

clearly erroneous." Archer v. Trans/Am. Servs., Ltd., 834 F.2d 1570, 1572–73 (11th Cir. 1988). "Under clear error review, the district court's determination must be affirmed 'so long as it is plausible in light of the record viewed in its entirety.'" Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp., 575 F.3d 1180, 1186 (11th Cir. 2009) (quoting Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II, 329 F.3d 809, 816 (11th Cir. 2003)). We review de novo the conclusion that the United States did not owe a duty to Green under the Longshore and Harbor Workers' Compensation Act. See Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc., 565 F.3d 1293, 1298 (11th Cir. 2009).

### III. DISCUSSION

Green blames his injuries on the negligence of the United States. Green argues that Roberts's role in the steel renewal project establishes that he was an agent or subagent of the United States. Green attributes to the United States Roberts's involvement in the project and argues that the starboard aft peak tank was under the active control of the United States. In the alternative, Green argues that the United States had a duty to intervene to protect him.

The record supports the finding of the district court that Green failed to prove that Roberts was an agent of the United States. To create an agency relationship, both the principal and agent must consent to the agency and the

11

principal must control the agent. Restatement (Third) of Agency § 1 (2005); e.g., Commodity Futures Trading Comm'n, 575 F.3d at 1189. Green failed to introduce any evidence that the United States either knew that Marine Transport had hired Roberts or consented for Roberts to act on behalf of the United States. See Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1077 (11th Cir. 2003) (holding there was "no agency relationship" between two companies absent a "lack of acknowledgment" that one acted on behalf of another). Marine Transport retained Roberts for specific tasks, and Marine Transport was billed for Roberts's services. Roberts had significant discretion in the performance of his job, including when and how long he worked and the frequency with which he inspected the work performed by North Florida Shipyard. See Restatement (Second) of Agency § 14 cmt. b (1957) ("If the existence of an agency relation is not otherwise clearly shown, as where the issue is whether . . . an agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency."); see Commodity Futures Trading Comm'n, 575 F.3d at 1190 (relevant to control in agency relationship is authority to supervise and discipline the agent). Roberts could not bind the United States through its agent, Marine Transport. Although Marine Transport referred to Roberts as a

"Special Port Engineer," provided Roberts an office, and permitted him to sign inspection reports, Roberts could not contract on behalf of or obligate Marine Transport to pay for work performed on the Cape Edmont. Employees of North Florida Shipyard apparently recognized that Roberts had limited authority and disregarded his suggestions about changes to safety protocol. The United States had an agency relationship with Marine Transport, not Roberts.

The record also supports the finding that Green failed to prove that Roberts was a subagent of the United States. "A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) of Agency § 3.15(1). An agent must have "actual or apparent authority" to appoint a subagent, id. § 3.15(2), and Green submitted no evidence that Marine Transport could appoint subagents. Moreover, "[w]hen an agent is itself a corporation or other legal person, its officers, employees, partners, or members who are designated to work on the principal's account are subagents." Id. § 3.15 cmt. b. The district court found that Roberts was not an employee of Marine Transport, and Green does not challenge that finding.

After repair operations commence, a shipowner can be liable to the employee of a harbor contractor in one of two situations. First, an employee of a

13

harbor contractor can recover from the United States if it "actively involves itself in the [repair] operations and negligently injures [the employee] or . . . fail[s] to exercise due care to avoid exposing [the employee] to harm from hazards . . . encounter[ed] in areas, or from equipment, under the active control of the vessel during the [repair] operation." Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156, 167, 101 S. Ct. 1614, 1622 (1981). Second, an employee of a harbor contractor can recover from the United States under a "very limited duty" to intervene, Hunter v. Reardon Smith Lines, Ltd., 719 F.2d 1108, 1112 (11th Cir. 1983), if it had become "aware that the ship, its equipment or gear poses a danger" and that the harbor contractor had "act[ed] unreasonably to protect [its employee]." Roach v. M/V Aqua Grace, 857 F.2d 1575, 1581 (11th Cir. 1988); see e.g., Lampkin v. Liberia Athene Transp. Co., 823 F.2d 1497, 1501 (11th Cir. 1987).

We agree with the district court that Green cannot recover from the United States under the Longshore and Harbor Workers' Compensation Act because the United States did not breach a duty owed to Green. The United States was not involved actively in the steel replacement project such that it could be liable for allegedly inadequate ventilation. Green argues that the United States, by virtue of Roberts's regular inspections, was in active control of the starboard aft peak tank

14

and the equipment used to ventilate the tank, but the district court did not clearly err when it found that Roberts was not an agent of the United States.  Green failed to prove that any agent or employee of the United States had constructive knowledge of hazardous conditions in the tank.  Even if the United States had been involved actively, there was no evidence that it acted negligently.  Roberts and employees of North Florida Shipyard observed what appeared to be adequate ventilation in the tank and could rely on the opinion of the competent person who daily certified the tank that the work space was safe for hot work.  See Lampkin, 823 F.2d at 1502–03.  The United States also did not owe Green a duty to intervene.  Green failed to prove that the United States knew of a hazardous condition.  Green did not communicate his concerns about the ventilation system to an employee or agent of the United States.  See Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 218–20 (5th Cir. 1984) (mentioned in Roach, 857 F.2d at 1582).  Green argues that it was "open and obvious" from the deck of the ship that employees of North Florida Shipyard did not, during breaks, disconnect gas lines from the gas source, but Green did not prove that the failure to disconnect gas lines alone created a hazardous condition.  "[K]nowledge that a condition . . . exists[] does not imply knowledge that the condition is dangerous." Casaceli v. Martech Intern., Inc., 774 F.2d 1322, 1331 (5th Cir. 1985) (discussed in Roach,

15

857 F.2d at 1582). Moreover, the record supports the finding of the district court that Green knew that his cutting torch was leaking dangerous gases, yet he failed to have his torch repaired. Green was in the best, if not the only, "position to appreciate fully the risk and avoid the danger" created by his cutting torch. Stockstill v. Gypsum Transp., 607 F.2d 1112, 1117 (5th Cir. 1979).

## IV. CONCLUSION

The judgment in favor of the United States is **AFFIRMED**.