Vivian O. CARR, Plaintiff,

v.

STILLWATERS DEVELOPMENT COMPANY, L.P., and AIMCO (formerly Insignia Financial Group, Inc.), Defendants.

No. Civ.A. 98–T–987–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Sept. 7, 1999.

---

Richard J. Stockham, III, James Herbert Wilson, Stockham & Stockham, P.C., Birmingham, AL, for Plaintiff.

Tara L. Helms, Watson Jimmerson, PC, Alan P. Judge, Alan P. Judge, PC, Hunstville, AL, Patricia Powell Burke, Patrick G. Nelson, Burr & Forman, Patricia Powell Burke, Ashley H. Hattaway, Patrick G. Nelson, Burr & Forman, Birmingham, AL, for Defendants.

## *ORDER*

MYRON H. THOMPSON, District Judge.

Plaintiff Vivian O. Carr, an African–American, brings this lawsuit against defendants StillWaters Development Company Limited Partnership and AIMCO (formerly known as Insignia Financial Group, Inc.) claiming racial discrimination and retaliatory discharge in violation of 42 U.S.C.A. § 1981. She also claims violation of the terms of her employment contract under Alabama state law. Properly invoking this court's jurisdiction under 28 U.S.C.A. §§ 1331 (federal question), 1343(a)(4) (civil rights), and 1367(a) (supplemental), she seeks declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees and costs. This lawsuit is now before the court on the

defendants' motions for summary judgment, which, for the reasons discussed below, are granted in part and denied in part.

## I. FACTS

In making its determination on summary judgment, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Accordingly, the facts, as gathered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the plaintiff's favor, are as follows.

Vivian O. Carr began working in 1984 as a housekeeper at the StillWaters Resort on Lake Martin in Tallapoosa County, Alabama. The resort is owned by the Arizona-based StillWaters Development Company. Carr was hired by Evergreen, the company with which StillWaters Development had contracted to manage the resort, and she was rehired in late 1996 by Insignia when it won the management contract. Insignia's new management team included the following:

- *Tom Miller*, who is white, was Insignia's Director of Hotel Operations.
- *Jim Greene*, who is white, was General Manager (also known as Property Manager) and reported to Miller.
- *William Hall*, who is white, later replaced Greene.
- *Deena Davis*, who is white, was Rooms Division Manager.

Carr was promoted in June 1997 to the position of Housekeeping Supervisor, with a raise in wage to $7.25 per hour. Rooms Division Manager Davis publicly announced Carr's promotion the next month in a memorandum, writing, "Vivian has worked for StillWaters since 1989 as a housekeeper and has been acting as Housekeeping Supervisor since early June. She has done an admirable job and we appreciate it."[1] So admirable, in fact, that when Davis later appraised Carr's job performance she gave Carr an overall rating of "good" and a rating of "very good" in the areas of dependability, guest relations, paperwork and reporting, cooperation and teamwork, and cost control.[2] Carr's personnel file shows no disciplinary action or negative notes from 1984 through 1997.[3]

The 13 years of a clean employment record ended in January 1998 when Teresa Allen was hired to the newly-created position of Executive Housekeeper. Allen's position in the Insignia hierarchy was supervisory to Carr and subordinate to Davis. The exact nature of Carr's status at this point is unclear: although General Manager Hall says that Carr was demoted to "Inspectoress," a nonsupervisory role, there were no records in her personnel file indicating such a change and, in fact, other records continue to refer to her position as "Housekeeping Supervisor."[4] Still, Hall has admitted that Allen's position was for all intents and purposes the same as Carr's.[5] Whereas Carr was paid $7.25 hourly, Allen was hired with a $20,000 salary.

Allen first reprimanded Carr at the end of April 1998, recording that Carr had been instructed to have the laundry aide wash new linen but, contrary to instructions, sent the staff home at 2:00 and left the linen unwashed.[6] Allen typed a per-

---

1. Plaintiff's Exh. 1.

2. Plaintiff's Exh. 2.

3. *See* Plaintiff's Exh. 5 (personnel file).

4. *See* Plaintiff's Exh. B, deposition of William Hall, at 16–17 (Allen was hired to replace Carr), 92 (neither Hall nor Davis had reprimanded Carr before hiring Allen), 100 (describing Carr's demotions); Plaintiff's Exh. 5 (Carr's personnel file); Exh. 6 (termination form that lists Carr's position as "Housekeeping Supervisor").

5. When asked why Carr was unqualified for the position given to Allen, Hall said, "Because Ms. Carr *had that position* and she wasn't getting the job done." Defendant AIMCO's Exh. 2, at 78 (deposition of William Hall) (emphasis added).

6. *See* Plaintiff's Exh. 5 (Carr personnel file, Corrective Counseling Form dated April 29, 1999, by Allen's signature).

formance appraisal complaining that Carr's "job performance remain[ed] unsatisfactory" despite "numerous verbal and written warnings" from Allen.[7] A second reprimand followed on May 14 for "poor job performance" and "refusing to do her duties as a supervisor," citing "daily inspections, daily office procedures, handling employee problems."[8] Allen began to leave regular notes in Carr's files, recording every perceived gaffe or omission.

At the end of May, following an informal lunch discussion between Carr and other employees in the housekeeping department about work-related issues, including concerns about racial discrimination and problems with unfair treatment of employees, a group of black housekeeping employees drafted a letter of complaint.[9] Although the letter is difficult to understand because the grammar is poor and the handwriting is at times illegible, and although it does not specifically use the words "racial discrimination" and appears on its face to address only minor specific events with specific employees, it does ultimately complain of unfairness and disparate treatment of black and white employees.[10] The letter concludes, "We feel like [Betty Patterson, who is white] is been discrimination to some of us employees."[11]

One of those employees requested a meeting with General Manager Hall. Hall convened a meeting with the housekeeping staff, commenced it with a discussion of StillWater's direction and history, and then opened it up for discussion of discrimination issues.[12] The staff was not forthcoming; Hall's own description of the meeting explains their reticence: "[A]s far as I was concerned, I was not very pleased with the meeting because I didn't get any response; and I was looking for a response to, you know, feel better about these allegations, and I just felt that there was something being withheld. Either they were intimidated or they just were generally reluctant to respond to anything."[13] The employees may have been reluctant because Hall appeared to want to avoid the subject of complaints about Allen's treatment of Carr or, since Allen herself was there, because the opportunity to complain seemed to be closed before it had even been opened.[14] Even though few complaints were aired at the meeting, much less any direct statement that Carr had incited the request for the meeting, Allen recorded this meeting in Carr's file as another example of insubordination.[15]

Carr's third reprimand came on June 9 in response to her handling of a thunderstorm at the resort. The reprimand cited "poor job performance" and "not ensuring proper safety procedures."[16] Accounts of this incident vary, but apparently Carr sent a van driver, in violation of a policy, to the golf colony during a storm to retrieve

---

7. Plaintiff's Exh. 5 (Carr personnel file, Statement of Review, dated May 1, 1998).

8. *Id.* (form dated May 14, 1999).

9. *See* Plaintiff's Exh. A, deposition of Carr, at 108–11; Plaintiff's Exh. 8 (letter of complaint).

10. For example, the third section of the letter complains that black and white employees are given different job duties. *See* Plaintiff's Exh. 8.

11. Plaintiff's Exh. 8.

12. *See* Plaintiff's Exh. A, Carr deposition, at 105–110.

13. *See* Plaintiff's Exh. B, Hall deposition, at 71.

14. *See* Defendant AIMCO's Exh. 4, deposition of Karen Trimble, at 70, 72 ("They just didn't say nothing.... I don't know was it the point because Teresa was there. I don't know whether everybody didn't want to express their feelings with her sitting right there or not.").

15. *See* Plaintiff's Exh. 5 (Carr personnel file, note dated May 29) ("The Housekeepers called a meeting with Mr. Hall. It was derived from a report that was done on Vivan [sic] Carr's job performance. After being told by her Supervisor not to tell her coworkers about the report, she did exactly that, causing an uprising in the department.").

16. *See id.* (form dated June 9, 1999).

two housekeeping employees who were stranded there.

The final sequence of events occurs over one weekend. On Friday, June 12, Carr delivered a letter to General Manager Hall, headed "Equal Opportunity Complaint," which listed "some ... discriminating facts," "just a few to get the ball rolling," and included observations about disparate treatment of white and black employees as well as a few observations about unfairness to herself directly.[17] The next day, Carr was ushered into a meeting with Allen and the assistant manager (there in place of Hall, who was out of town). There, Carr was given her fourth reprimand, which complained as follows: "Unsatisfactory or careless work, failure to meet quality standards. Inspections of public areas which is her assigned duty are unsatisfactory."[18] Carr was suspended pending further review by the General Manager. The following Monday, according to Hall, he investigated the listed complaints, judged them all to be groundless, and fired Carr.[19]

Carr filed this lawsuit on September 2, 1998, naming Insignia and StillWaters Development Company as defendants. Carr later substituted AIMCO for Insignia as a defendant because Insignia now operates under the name Apartment Investment and Management Company or AIMCO.

## II. DISCUSSION

Summary judgment can be granted only if, after viewing evidence and inferences in the nonmovant's favor, the court finds that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to dem-

onstrate that summary judgment is inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This shifting of the burdens of production and proof is governed by the substantive law of the dispute. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the movant and nonmovant's respective burdens vary whether the legal issues, to which the facts in question pertain, are ones for which the movant or nonmovant bears the burden of proof at trial).

## A. SECTION 1981

Although Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C.A. §§ 1981a, 2000e through 2000e–17), neither preempts 42 U.S.C.A. § 1981 as a basis for litigating claims of employment discrimination, *see Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975), nor contributes its jurisdictional prerequisites such as exhaustion of administrative remedies to § 1981 claims, *see Hines v. D'Artois,* 531 F.2d 726, 734 (5th Cir.1976),[20] the analytical frameworks of Title VII jurisprudence apply to claims of employment discrimination pursued under § 1981. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework."). For purposes of summary judgment, then, the relative burdens of production and proof shift according to the kind of evidence proffered by the plaintiff to show discriminatory intent: if the plaintiff offers direct evidence, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made regardless of discriminatory intent; if, in-

17. *See* Plaintiff's Exh. 9.

18. *See* Plaintiff's Exh. 5.

19. *See* Plaintiff's Exh. B, Hall deposition, at 40–50.

20. In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

stead, the plaintiff offers circumstantial evidence, the plaintiff must first establish a prima facie case of discrimination and, if successful, the employer must respond with legitimate, nondiscriminatory reasons for the adverse employment decision, which the plaintiff finally must discredit as pretextual. *See Standard,* 161 F.3d at 1330–31.

### 1. Racial Discrimination

Carr alleges racial discrimination based on three theories: disparate treatment in pay, disparate treatment in the terms of her supervisory position, and discriminatory discharge. For the theory of unequal pay, Carr alleges that Allen was hired in essentially the same position Carr had occupied and that Allen was paid more money in the position. For the theory of disparate treatment in the terms of her supervisory position, Carr alleges that Allen would invite Carr to interview black applicants for housekeeping jobs but not white applicants and that Allen would tell only the black employees—not the white employees as well—that Carr was their supervisor. For the theory of discriminatory discharge, Carr alleges that she was terminated because she is black and replaced by Betty Patterson, who is white.

 Carr argues that, by introducing Hall's purported admission that there were problems with race discrimination or harassment in the housekeeping department, she has proffered direct evidence of discriminatory intent.[21] She has not. Direct evidence is "evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard,* 161 F.3d at 1330. To serve as direct evidence of Carr's claim, the admission of discrimination generally in the housekeeping department requires an additional inference—namely, that Carr herself was indeed a victim of that discrimination. Carr's evidence of discrimination is, then, circumstantial, thus subjecting her case to the three-step burden shifting described above.

#### a. Prima Facie Case

Accordingly, Carr must present a prima facie case. The prima facie case of employment discrimination has the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for a specific condition or benefit of employment; (3) the plaintiff was denied the condition or benefit despite her qualifications; and (4) that condition or benefit was enjoyed by or given to someone who was not a member of the plaintiff's protected class. These elements have slightly more specific formulations according to the particular theory of discrimination alleged. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973) ("The facts necessarily will vary in [employment discrimination] cases, and the specification . . . of the prima facie proof required [for a particular theory of discrimination] is not necessarily applicable in every respect to differing factual situations."); *see also Walker v. Mortham,* 158 F.3d 1177 (11th Cir.1998) (eliminating 'relative qualifications' as an element of the prima facie case).

 Because Carr is black, she meets the first element for all the theories of discrimination argued. Carr has likewise carried her initial burden of showing that she was qualified for the disputed job conditions. She was a housekeeper at the StillWaters Resort for 13 years prior to the adverse employment decisions; she had a record clean of any negative employment history; and her performance was favorably evaluated by Davis before Allen was ever hired. In fact, although it was Insignia's policy to keep written records of negative performance appraisals and employees' needs for improvement and cor-

---

21. *See* Plaintiff's Exh. 13 (affidavit of James Craig); Plaintiff's Exh. B (deposition of William Hall), at 79.

rection, none was recorded until the rapid spate of negative comments filed by Allen in the three-month period prior to Carr's termination.

Despite her qualifications, as shown in the plaintiff's initial burden, Carr was denied the ability to apply for or receive pay equal to that given Allen, was denied supervisory authority over employees of all races, and was demoted and discharged. Finally, Carr has also sufficiently proven that persons outside her protected class were accorded the disputed job benefits: Allen, who is white, was given more pay for what William Hall admits was the same position, albeit in a different name; Allen again was given supervisory authority over all housekeeping employees whereas Carr's authority was racially ghettoized; and Patterson, who is white, replaced Carr as Housekeeping Supervisor.

### b. Legitimate, Nondiscriminatory Reasons

Because Carr has met the requirements of her prima facie case, the burden shifts to the defendants to proffer legitimate, nondiscriminatory reasons for the disputed job decisions. "This is a burden of production, not persuasion. [The defendants] need only produce evidence that could allow a rational fact finder to conclude that [the adverse employment decisions were] not made for a discriminatory reason." *Standard,* 161 F.3d at 1331.

■ The defendants have wholly ignored Carr's disparate treatment theories and addressed only the discharge theory. They have thus failed entirely to meet their burden to provide legitimate nondiscriminatory reasons for the inequality in pay or supervisory authority. These issues therefore continue to present genuine disputes of material fact, and summary judgment on these theories is denied.

As for Carr's theory of discriminatory discharge, the defendants offer several nondiscriminatory reasons. For the most part, the defendants reiterate reasons recorded in Carr's employment file for the four reprimands. The defendants also offer the testimony of Hall that Carr was essentially demoted because she could not motivate the housekeeping department to achieve an acceptably high standard of cleanliness and that Carr was ultimately fired because she was insubordinate, telling Hall before issuance of the fourth and final reprimand that she refused to comply with Allen's directions or recognize Allen's supervisory role over her. All of these reasons are legitimate and nondiscriminatory, and the defendants have thus carried their burden of production.

### c. Pretext

The burden shifts finally to Carr to discredit as pretextual the defendants' alternative explanation of her discharge. Carr may satisfy this burden by persuading the court either directly that a discriminatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). "Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990).

■ Carr has offered evidence from which a reasonable jury could conclude that the defendants' proffered alternative explanations are not worthy of credence. The observations recorded in the reprimands are all the observations of Allen; that they are recorded in Carr's personnel file does not necessarily give them more credibility than if they were deposition testimony. The four reprimands were filed in rapid succession in the three-month period leading to termination, following a 13–year history free of reprimands and within a year of a positive job appraisal. The timing alone supports a conclusion of pretext.

There is also very strong evidence that the reprimands were part of a plan conceived in advance to terminate Carr. Allen placed a hand-written note in Betty Patterson's personnel file to recommend Patterson for a raise. The note includes this

telling statement: "I would also like for her to fill the position of Housekeeping Supervisor when it becomes open."[22] Patterson won that raise on April 30, 1998, the same day Allen gave Carr her first written reprimand.[23] Carr has also offered even more direct evidence of pretext, through the statement of Patterson, the white person hired to replace her:

> "I have heard Ms. Allen say that she (Ms. Allen) was going to 'get rid of that nigger,' (referring to Ms. Carr). She said that to me on several occasions. Ms. Allen let me know that I was going to replace Ms. Carr before she was terminated and that I would get her job. Ms. Davis also confirmed this so that it was clear that no matter what Ms. Carr did they were going to fire her.... I have also heard Ms. Allen use the term 'nigger' on numerous occasions. I have heard her say that 'those niggers don't know anything,' referring to the women in housekeeping. With regard to Ms. Carr, Ms. Allen kept me informed of the regular write-ups she was putting in Ms. Carr's file in order to terminate her. She even had me do a write-up on Ms. Carr so she could terminate her. In it I wrote that Ms. Carr had an attitude toward me, but it was not unusual given how obvious the efforts by Ms. Allen were to set her up and run her off...."[24]

Because Carr has made a significant showing of pretext, summary judgment is inappropriate on the discharge theory.

### 2. Racial Harassment

Carr alleged racial harassment in her complaint, but only to claim breach of contract under Alabama law—the theory being that she suffered harassment and other discrimination that violated the terms of her employment contract with Insignia. That claim is discussed below. Carr reintroduces a harassment theory in her response brief to the defendants' motions for summary judgment, inserting it for the first time as a constituent of her § 1981 claims. Even if the harassment theory of her § 1981 claim was timely introduced in this litigation, it must be summarily rejected, as Carr makes only the bald assertion that Allen's write-ups constituted harassment and completely ignores her burden of showing that such behaviors amount to unwelcome racial harassment so severe and pervasive as to affect the terms and conditions of employment. If Carr does indeed seek to pursue a claim of racial harassment, it fails summary judgment.

### 3. Retaliatory Discharge

■ Title VII's prohibition against discharge and adverse employment actions in retaliation for protected activity applies to claims brought under § 1981. *See Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409–13 (11th Cir.1998) (finding retaliation claims cognizable under § 1981 after 1991 revisions to the statute). Because Carr has not provided direct evidence of retaliation, the burdens shift as above for the discrimination claims: the plaintiff must establish a prima facie case of retaliation; if the plaintiff is successful, retaliation is presumed, and the burden shifts to the defendant to produce legitimate reasons for the adverse employment action; if the defendant is successful, the presumption of retaliation is rebutted, and the burden shifts again to the plaintiff to discredit the defendants' alternative explanation as pretextual. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993).

■ The elements of the prima facie case of retaliation are (1) protected activity, (2) adverse employment action, and (3) a causal link between the protected activity and the adverse action. *Id.* at 919. Voicing one's concerns about racial discrimination to one's superiors, provided that expression is not unreasonably disrup-

---

**22.** Plaintiff's Exh. 7 (Patterson personnel file).

**23.** *See* Plaintiff's Exh. 7 (personnel file of Betty Patterson).

**24.** *See* Plaintiff's Motion to Supplement Evidentiary Submission, filed July 30, 1999, Exh. A (affidavit of Betty Patterson).

tive or does not render the employee incapable of doing his or her job, is protected activity. *See Holifield v. Reno*, 115 F.3d 1555 (11th Cir.1997); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1142–47 (5th Cir.1981) (discussing kinds of protected and unprotected activity), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). For the 'causal link,' the plaintiff need only show some relationship between the protected activity and the adverse action. *See E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993) (holding the plaintiff "merely has to prove that the protected activity and the negative employment action are not wholly unrelated").

■ Carr's letter, much like the previous letter of complaint from the housekeeping department, lists specific events that in the aggregate amount to complaints of pervasive discriminatory disparate treatment of white and black employees at StillWater. Thus, Carr complained of discrimination in a letter submitted directly to General Manager Hall; the next day, she was given the last reprimand and suspended; the following Monday, she was officially fired. In essence, immediately after she complained of discrimination, she was fired. The temporal proximity between the complaint and her termination suffices to show the required causal connection for purposes of the prima facie case of retaliation. The defendants reassert as legitimate non-retaliatory reasons the same alternative explanations proffered against the claim of discriminatory discharge. Those reasons have already been shown to be pretextual. Summary judgment on this claim must therefore be denied.

## B. BREACH OF EMPLOYMENT CONTRACT

The claim that harassment and discrimination violated the employment contract between Carr and AIMCO (formerly known as Insignia) is governed by Alabama law. Carr complains that she suffered the discrimination and harassment discussed above in violation of the anti-harassment policy in the employee handbook. Carr's theory is that the policy violation is a breach of the employment contract established by the handbook and the accompanying implied covenant of good faith.

■ Under Alabama law, provisions in employee handbooks can indeed establish terms of the employment contract. To do so, the handbook terms must meet the requirements of classic contract law: "First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration." *Hoffman–La Roche, Inc. v. Campbell*, 512 So.2d 725, 735 (Ala.1987). Intent to contract is determined by the parties' outward manifestations; accordingly, "if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook." *Id.* at 734 (citing *McCluskey v. Unicare Health Facility, Inc.*, 484 So.2d 398, 400 (Ala.1986)). Thus, the Supreme Court of Alabama "has refused to hold the provisions of a handbook enforceable against an employer where the handbook at issue expressly stated [that handbook terms are not to be construed as contract terms]." *Id.*

■ Whether the terms of a handbook meet these requirements is generally a question of law. *See Dykes v. Lane Trucking, Inc.*, 652 So.2d 248, 250 (Ala. 1994). There are, then, no genuine disputes of material facts in Carr's contract claim, and this court proceeds directly to decide whether the defendants are entitled to judgment as a matter of law.

■ The defendants are indeed entitled. The first page of the handbook in question states unequivocally that the handbook's terms do not constitute contract terms:

"This handbook will provide you with an outline of our company policies and procedures and the expectations of our working relationship. The Standards of Conduct outlines [sic] the rules and regulations in effect as a condition of your employment."

"StillWaters Resort endorses and supports all Federal and State employment laws and regulations. We also embrace the doctrine of 'employment at will.' Nothing in the policies, procedures or standards of conduct shall constitute an employment contract."

Plaintiff's Exh. 12, at 2. Carr was an at-will employee; the handbook's policies were merely precatory and did not constitute an enforceable agreement.[25] Without a contract, Carr cannot claim breach, and the defendants are therefore granted summary judgment on the state-law claim.

### C. LIABILITY OF OWNER

For its part, StillWaters Development asserts only that it cannot be held liable for any discrimination committed by Insignia. StillWaters Development urges that the language of the management contract with Insignia, which expressly disclaims any agency relationship, compels this conclusion. Further, StillWaters Development stresses that the management contract granted Insignia exclusive authority over its employees and that StillWaters Development was ignored the only time a StillWaters Development official urged reconsideration of an employment decision.

■ Principals can be held liable for the employment discrimination perpetrated by their agents if the latter were aided in the discrimination by the agency relationship itself. *See Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559 (11th Cir.1987). The question whether a party acted as the agent of another for purposes of § 1981 is a question of fact. *See Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052 (M.D.Ala.1990) (Thompson, J.). Thus, the factual issue of agency is material to this case.

Express disclaimers of agency do not necessarily eliminate the existence of an agency relationship:

"The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so. To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency relationship exists although the parties did not call it agency and did not intend the legal consequences of the relationship to follow."

Restatement (2d) of Agency § 1 cmt. b (1958). Otherwise, parties could enjoy the benefits of an agency relationship free of legal consequences simply by the insertion of a disclaimer clause in the agency contract.

■ Agency is the "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Id.* § 1. The key to finding the existence of an agency relationship is control. *See, e.g., id.* § 14 ("A principal has the right to control the conduct of the agent with respect to matters entrusted to him."). "If the existence of an agency relation is not otherwise clearly shown, as

---

**25.** The handbook repeatedly stresses that Carr is an at-will employee. *See, e.g.,* Plaintiff's Exh. 12, at 6 ("In no event shall hiring be considered as creating a contractual relationship between the employee and StillWaters Resort; and, unless otherwise provided in writing by the General Manager, all such employment relationships shall be defined as 'employment at will....' "), 13 (listing examples of unacceptable activities and adding, "This list is not an all [sic] inclusive and, notwithstanding this list, all employees remain 'employed at will.' ").

where the issue is whether ... an agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency." *Id.* § 14 cmt. b. That the agreement creates some limits on the amount of control exercised by the principal likewise is not necessarily dispositive:

"The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times. The principal's right to control is continuous and continues as long as the agency relation exists, even though the principal agreed that he would not exercise it. Thus, the agent is subject to a duty not to act contrary to the principal's directions, although the principal has agreed not to give such directions. Further, the principal has power to revoke the agent's authority, although this would constitute a breach of his contract with him. . . . The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective."

*Id.* § 14 cmt. a.

■ Under this test, Carr has established a genuine issue of material fact as to whether Insignia was acting as an agent of StillWaters Development when the alleged discrimination and retaliation occurred. StillWaters Development did not simply hand over management of its resort to Insignia; it expected Insignia to manage the resort—and exercise its best efforts in doing so—according to standards set by StillWaters Development in the contract and subject to ongoing approval. The

agreement explicitly insists that Insignia was expected to use its "best efforts" to "supervise and direct the management and operation of the Resort in a professional manner and in accordance with the request of the Owner." [26] Although Insignia is indeed deemed the employer of resort staff, Insignia was not allowed to hire anyone in the office of general manager, the office vested with the most discretion in managing the resort, without written approval from StillWaters Development.[27] Insignia's continued enjoyment of the management contract is subject to achieving annually-determined performance standards.[28]

StillWaters Development's continued control over the relationship with Insignia was realized in practice. The parties had "frequent conversations" and created a "continuing relationship as [they] tried to mold and direct the entire operation into a smooth resort operation." [29] Their meetings were not mere formalities:

"We would discuss financial terms, revenues or expenses. We would discuss levels of maintenance or specific projects for maintenance or activities. We would discuss operations for golf, marina, time share. . . . We had weekly reporting sessions. We had weekly staff meetings via telephone in which an agenda would be established and reporting would occur." [30]

Thus, even though the agreement denies agency, Insignia contracted to perform services for the benefit of StillWaters Development and subject to StillWaters Development's ongoing control. Summary judgment will not therefore eliminate StillWaters Development from this suit.

## III. CONCLUSION

For the reasons given above, the court concludes that Carr has established her

---

26. *See* Plaintiff's Exh. 16, Management Agreement, § 3.1.

27. *Id.* § 1.1(1).

28. *See id.* § 3.2.1 ("The failure of Manager to meet the performance standards ser forth in any individual Division in the Annual Plan

shall subject Manager, at Owner's option, to termination of [the agreement].").

29. *See* Plaintiff's Exh. B (Hall deposition), at 89.

30. *Id.* at 90.

claims of discrimination and retaliation but has failed to establish her claims of harassment and contract breach.

Accordingly, it is ORDERED as follows:

(1) The motion for summary judgment filed by defendant StillWaters Development Company Limited Partnership on June 24, 1999, and the motion for summary judgment filed by defendant AIMCO (formerly known as Insignia Financial Group, Inc.) on June 22, 1999, are granted to the extent that judgment is entered for the defendants on the claims against them under 42 U.S.C.A. § 1981 for racial harassment and the claims against them under Alabama law for breach of employment contract.

(2) The motions are denied in all other respects.