[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 21, 2009
THOMAS K. KAHN
CLERK

_____

No. 06-14270

_____

D. C. Docket No. 04-80132-CV-WPD

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff-Appellant,

versus

GIBRALTAR MONETARY CORP., INC.,
CHARLES I. FREMER,
THOMAS J. CLANCY,
EDWARD T. JOHNSON,
FOREX CAPITAL MARKETS, LLC,
JAYSON KLINE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 21, 2009)

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,* District Judge.

PER CURIAM:

Appellant, the Commodity Futures Trading Commission ("CFTC"), appeals from the district court's non-jury trial order granting judgment in favor of Appellee, Forex Capital Markets ("FxCM"), on the CFTC's claim that FxCM should be held vicariously liable under 17 C.F.R. § 1.2 for Gibraltar Monetary Corporation, Inc.'s ("GMC") violations of the Commodities Exchange Act ("CEA") and CFTC Regulations, 17 C.F.R. § 32.9(a) and (c).[1] The district court found that (1) the vicarious liability provision in the CEA, 7 U.S.C. § 2(a)(1)(B), on which the CFTC relied did not apply to the transactions involved in this matter; (2) the identically worded vicarious liability regulation, 17 C.F.R. § 1.2 could be applied to the transactions in this matter; (3) the standard for vicarious liability under either the vicarious liability regulation or the CEA is the common law test

*Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

[1]§ 32.9 entitled, "Fraud in connection with commodity option transactions" states:
   It shall be unlawful for any person directly or indirectly:
   (a) To cheat or defraud or attempt to cheat or defraud any other person;
   (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;
   (c) To deceive or attempt to deceive any other person by any means whatsoever;
   in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

for agency; and (4) FxCM could not be held vicariously liable as GMC's principal under this test.

On appeal, the CFTC argues that (1) both the vicarious liability statute and the vicarious liability regulation apply to this matter; (2) the test for vicarious liability under either of these provisions is a "totality of the circumstances" standard; and (3) under either a "totality of the circumstances" or a common law agency standard the district court committed clear error in finding that GMC was not acting as FxCM's agent. For the reasons set forth below, we affirm the district court's judgment in favor of FxCM and hold that under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, the test for vicarious liability is common law agency, and the district court did not commit clear error in finding under this test that GMC was not acting as FxCM's agent when it violated the CEA.

## I.    Background

Appellant CFTC is an independent federal regulatory agency that administers and enforces the CEA and the regulations promulgated under it. Defendant GMC was a Florida corporation which solicited members of the public to invest and trade in foreign currency options and advised these members on trading. GMC was not and was not required to be registered with the CFTC. Defendants Jayson Kline, Charles Fremer, Edward Johnson, and Thomas Clancy

3

were officers and employees of GMC. Prior to the incorporation of GMC, Kline, Fremer, and Johnson were involved with other companies charged with fraud by the CFTC. At the time relevant to this action, Kline was under an enforcement order and cease and desist order from the CFTC. FxCM is the world's largest non-bank futures commission merchant or "FCM" dealing exclusively in retail foreign exchange, or forex. FxCM is registered as an FCM with the CFTC and the NFA. FxCM trades spot forex and forex options in principal-to-principal trades.

On April 11, 2002, FxCM and GMC signed an Introducing Agreement ("the Agreement") and entered into a business relationship. Under the terms of the Agreement, GMC agreed to solicit customers to engage in forex options transactions and to refer them exclusively to FxCM to trade. Every time a GMC customer made a trade with FxCM, FxCM would put a commission in an account for GMC. FxCM claims that it did not investigate GMC before entering into this relationship and that it was unaware that its officers and employees had previously been charged with fraud. Under the terms of the Agreement, FxCM did not "(a) control Gibraltar's location; (b) control or supervise the hiring of Gibraltar employees; (c) train, supervise, or discipline Gibraltar employees; (d) control, develop, or supervise the trading strategies of Gibraltar; (e) control, develop, or

supervise Gibraltar's marketing practices; (f) share common employees with Gibraltar; or (g) split commissions with Gibraltar."  (R-287 at 6).

GMC solicited customers based upon FxCM's customer qualification standards.  GMC sent each customer a package of forms necessary to open a trading account with FxCM.  This package included a Risk Disclosure Statement, a Notice to Traders,[2] a Trader Agreement,[3] an FX Agreement, an Account

---

[2]This form stated:

> FxCM does not control, and cannot endorse or vouch for the accuracy or completeness of any information or advice Trader may have received or may receive in the future from Referring Agent or from any other person not employed by FxCM regarding foreign currency or exchange ("Forex") trading or risks involved in such trading.  If Referring Agency or any other third party provides Trader with information or advice regarding Forex trading, FxCM shall in no way be responsible for any loss to Trader resulting from Trader's use of such information or advice.  Trader understands that Referring Agent and many third party vendors of trading systems, courses, programs, research or recommendations are not regulated by a government agency.

(R-287 at 7).

[3]This agreement stated:

> Trader fully acknowledges that should Trader grant trading authority or control over Trader's account to a third party ("Trading Agent"), whether on a discretionary or non-discretionary basis, FxCM shall in no way be responsible for reviewing Trader's choice of such Trading Agent nor making any recommendations with respect thereto.  Trader understands that FxCM makes no warranties nor representations concerning the Trading Agent, that FxCM shall not be responsible for any loss to Trader occasioned by the actions of the Trading Agent and that FxCM does not, by implication or otherwise, endorse or approve of the operating method of the Trading Agent.  If Trader gives Trading Agent authority to exercise any of its rights over Trader's account(s), Trader understands that Trader does so at Trader's own risk.

(R-287 at 8).

5

Application Form, and a Limited Power of Attorney Form.[4]  The customers mailed their money to FxCM and their completed forms to GMC, which checked over them to ensure the customer had filled them out correctly, and then forwarded them on to FxCM.  After the customers were signed up, GMC advised them on trades and the customers had access to online research through FxCM.  GMC had 273 clients; only thirteen profited from their investment with FxCM; most others lost their entire investment.

On February 10, 2004, the CFTC filed an enforcement action against FxCM and named GMC, Kline, Fremer, Chancy, and Johnson as defendants.  The CFTC charged that GMC fraudulently solicited customers to trade off-exchange options with FxCM and in doing so violated the CEA, 7 U.S.C. § 1, *et seq.*, and the regulations promulgated under it, 17 C.F.R. §§ 1, *et seq*.  The complaint charged GMC with derivative liability for its employees' fraud under a theory of respondeat superior and FxCM with derivative liability for this same fraud under an agency theory.  The court ultimately entered default judgment against GMC.  Clancy, as GMC's compliance officer, executed a consent order and agreed to testify for the CFTC.  The instant appeal arises out of the non-jury trial of the

---

[4]FxCM mandated in the Agreement that GMC require all customers to sign the Power of Attorney.

remaining three individual defendants and FxCM that occurred between August 30 and September 12 of 2005.

The evidence at trial consisted primarily of the testimony of seven GMC customers, one state securities compliance officer, one CFTC investigator, two representatives from FxCM, two expert witnesses, Clancy, and remaining individual defendants Jayson Kline, Charles Fremer, and Edward Johnson.

The seven GMC customers testified at trial about what they were told by GMC about forex investment. Their testimony revealed that (1) GMC de-emphasized the risk of forex investment and (2) embellished the potential for gains and the gains that their existing customers were experiencing. GMC agents persuaded customers to buy foreign exchange options for reasons associated with current events such as September 11, 2001, and the Iraq war. GMC employees did not explain to customers that (1) there was a chance that their options would expire worthless; (2) current events were already factored into the price of forex options; (3) nearly all Gibraltar investors were losing money on their investments; (4) several employees at GMC had worked for investment firms that were sanctioned for sales fraud; and (5) a permanent injunction and cease and desist order had been entered against Kline to enjoin him for committing commodities fraud.

The customers' testimony also revealed that (1) GMC agents coached customers on what to say to GMC's compliance officer when questioned about their understanding of the risk associated with forex trading; (2) some of GMC's customers believed that GMC and FxCM were working together; (3) some customers thought their investment would be safer because FxCM was licensed and regulated; (4) some customers contacted FxCM directly for information on accessing online trading accounts and tax advice on loss write-offs; and (5) some customers complained directly to FxCM about GMC's management of their accounts. One customer testified that he asked FxCM whether he could trade directly with FxCM using the account that was created when GMC acted as his agent; FxCM informed him that he would have to open a new account. In 2002, the Utah Department of Commerce investigated GMC, and an investigator posed as an interested client. At trial, the investigator testified that a GMC agent made comments to her similar to those testified to by the real GMC customers.

When former compliance officer Clancy testified at trial, his testimony revealed that GMC referenced FxCM's registered and regulated status to make customers more relaxed about placing trades through GMC and that if GMC customers complained to FxCM, then FxCM directed the complaints back to

GMC. One particular e-mail message from FxCM to Clancy following a complaint by a GMC customer, on which the court relied, stated:

> [a]s you recall, we have already discussed the need for you guys to monitor your marketing advertising methods, and I feel that I must re-emphasize this. As these complaints reflect on the way we do business. I must now ask you to give me a written description of the kind of advertising/ marketing methods you are using, include a copy of any material you may use.

(R-287 at 25). Clancy explained the normal procedure for placing a trade: He would call the FxCM order desk and give FxCM the client's number, quantity of purchase, and month of expiration; the FxCM employee responded with a strike price; and he generally accepted the price offered without making a counteroffer. He explained that GMC selected the expiration date of the option, while the customers selected the quantity of options to purchase.

On the basis of the above facts and testimony, the district court found that (1) Defendant Johnson violated 7 U.S.C. § 6c(b)[5] and 17 C.F.R. § 32.9(a) & (c);[6] (2) Defendants Kline and Fremer violated 7 U.S.C. § 13c(b)[7] and CFTC

---

[5]This section makes it unlawful for a person to enter into any commodities option transaction "contrary to any rule, regulation, or order of the [CFTC] prohibiting any such transaction or allowing any such transaction under such terms and conditions as the [CFTC] shall prescribe." 7 U.S.C. 6c(b). The underlying rule violated here is Regulation 32.9.

[6]As stated in note 1, *supra*, section (a) prohibits cheating or defrauding in connection with a commodity option transaction, and section (c) prohibits deceiving by any means whatsoever.

[7]      Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations,

Regulation 1.2; and (3) Defendant Kline violated 7 U.S.C. § 9.[8] The court ordered

Defendants Kline, Fremer, and Johnson to pay more than $2,752,377.50 in

restitution to 253 of GMC's customers. The court also entered civil penalties

against these individuals and granted injunctive relief.

The court declined to hold FxCM vicariously liable for the actions of GMC

and its employees. The court found that the vicarious liability provision of the

CEA did not apply to the relationship between FxCM and GMC, but that the

identically worded vicarious liability regulation promulgated by the CFTC did

apply. The district court discussed the standard for vicarious liability using the

language of both common law agency and the "totality of the circumstances." [9]

The court ultimately relied, however, on a three-part test it drew from *Webster v.*

---

or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b).

[8]This section entitled, "Exclusion of persons from privilege of 'registered entities,' procedure for exclusion; review by court of appeals," grants the Commission the power to revoke and suspend trading privileges and registration. 7 U.S.C. § 9.

[9]The district court's opinion addressed both apparent and implied actual authority and found neither. The parties' arguments on appeal focused on implied actual authority, and we address only that portion of the district court's opinion here.

*Aiello*, No. 98-R005, 98-R009, 98-R010, R075, 1999 CFTC Lexis 26 at *97-98

(CFTC Feb. 1, 1999).[10]

> To demonstrate the existence of implied actual authority, a party must provide evidence that: (1) the purported agent and purported principal *acquiesced* to the relationship, (2) the purported principal gave *sufficient support* to the purported agent, and (3) the purported principal *exercised control* over the purported agent.

(R-287 at 40 (emphasis added)).

The district court found that the parties had not acquiesced to a relationship because the record contained no evidence that FxCM authorized or condoned the use of its name by GMC or that GMC indicated to potential clients that it was FxCM's agent. The court concluded that FxCM did not provide GMC with sufficient support because there was no evidence in the record that FxCM provided GMC with market and research reports, manuals to be used in day-to-day business operations, or customer leads. Finally analyzing control, the court found that FxCM exercised far less control over GMC than in other cases where the purported agent was determined to have been acting autonomously. The court found it particularly relevant that GMC and FxCM were incorporated

---

[10]The district court opinion actually cites to *Buckner v. Refco, Inc.*, CFTC Docket No. 00-R122, 2001 CFTC Lexis 53 (CFTC April 25, 2001), and pages 97-98. *Buckner* does not contain these pages or this authority. We presume that the district court meant *Webster* given the context and the pages cited.

independently, maintained separate ownership, had no common employees, and did not coordinate their sales efforts. The CFTC appealed.

## II. Discussion

We must determine whether the district court correctly articulated the test for vicarious liability under the vicarious liability statute and vicarious liability regulation at issue and whether the district court clearly erred in applying that standard to find that GMC was not acting as FxCM's agent when it violated the CEA.

On appeal, the CFTC argues that the district court erred when it required that the CFTC demonstrate that FxCM "controlled" GMC in order to establish vicarious liability.[11] The CFTC insists that while control is a relevant factor it is not dispositive, and the CFTC has traditionally considered a much broader range of evidence in CEA cases and has applied a totality of the circumstances test. The CFTC maintains that had the court applied this "totality of the circumstances" test, it would have found FxCM vicariously liable. In the alternative, the CFTC contends that the district court erred in finding that FxCM did not control GMC.

---

[11]FxCM contends that the CFTC waived its argument that the vicarious liability standard under the CEA is broader than common law liability. It appears that the CFTC properly preserved this argument in the district court. (*See* DE 332 at 87) ("Under 2(a)(1) the case law is we don't need to show control. Under common law agency we do.").

The district court's determination of the correct standard for vicarious liability under the relevant vicarious liability provisions is a matter of law which we review *de novo*. *United States v. Trainor*, 376 F.3d 1325, 1330 (11th Cir. 2004). The district court's determination regarding the scope of vicarious liability and the principal-agent relationship is a question of fact. *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 173 (5th Cir. 1975) ("The existence and scope of principal-agent relationship is generally for the jury to determine."). We review a district court's findings of fact for clear error. *Archer v. Trans/American Servs., Ltd.*, 834 F.2d 1570 (11th Cir. 1988); *Naviera Neptuno S.A. v. All Intern. Freight Forwarders, Inc.*, 709 F.2d 663, 665 (11th Cir. 1983). This standard is very deferential and we will not reverse the district court unless we find that after making all credibility choices in favor of the fact-finder and reviewing the record as a whole, it is clear that a mistake has been made. *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*, 137 F.3d 1455, 1473 (11th Cir. 1998). Under clear error review, the district court's determination must be affirmed "so long as it is plausible in light of the record viewed in its entirety." *Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, 329 F.3d 809, 816 (11th Cir. 2003) (quotation marks omitted). In other words, "where there are two permissible views of the evidence,

13

the factfinder's choice between them cannot be clearly erroneous." *Jemison v. Nagle*, 158 Fed. Appx. 251, 253, 2005 WL 3359103, *1 (11th Cir. 2005).

## A. District Court Correctly Applied Common Law Rules of Agency

We have discussed vicarious liability under the CEA on a number of occasions; however, this is the first time we have been called on to determine whether it requires an element of control.[12]  *See CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir.1999) (holding brokerage house guilty for fraud of its agents, salespeople or registered "associated persons" under Regulation 1.2 and section 2(a)(1)); *JCC, Inc. v. CFTC*, 62 F.3d 1557 (11th Cir.1995) (same); *Clayton Brokerage v. Commodity Futures Trading Commission*, 794 F.2d 573, 581 (11th Cir. 1986) (addressing employee and employer situation and quoting H.R. Rep. No. 565 Part I, 97th Cong., 2d Sess. 105, *reprinted in* 1982 U.S. Code Cong. & Ad. News 3871, 3954 (finding that CEA "provides respondeat superior and general principal-agent standards for imposing liability on employers and principals for the acts of their employees or agents")).

---

[12]Because the district court determined that 7 U.S.C. § 2(a)(1)(B) could not be applied to the instant matter, the district court analyzed vicarious liability under Regulation 1.2; however, as the district court acknowledged, when a statute and a regulation contain virtually identical language, interpretations of one may be used to analyze the other.  (R-287 at 39  n.8).  Therefore, our holdings on the proper standard for vicarious liability under the CEA will apply to both the statute provision, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2.  We do not find it necessary to rule in this matter whether the district court correctly found that section 2(a)(1)(B) could not be applied to the instant case.

Numerous other courts of appeal have considered the standard for vicarious liability under the CEA. A majority of these decisions, like the district court opinion here, use language which conflates the totality of the circumstances test and the control test for common law agency. A survey of this appellate case law reveals no clear precedent as to whether the vicarious liability statute and regulation are broader than the common law as the CFTC suggests. One group of cases uses a mixture of totality of the circumstances, respondeat superior, and common law agency language without explicitly addressing control;[13] one group of cases addresses factually similar, but legally distinguishable circumstances, and finds control necessary;[14] and a final case addresses factually similar but legally

---

[13] *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) (applying totality of the circumstances approach without mentioning control); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986) (Posner, J.) (explaining CEA section 2(a)(1) enacts variant of common law respondeat superior and using totality language).

[14] *See Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738, 743 (8th Cir. 2003) (finding that "[d]etermining whether an agency relationship exists hinges on the principal's right to exercise control over the activities of the agent" without discussing section 2(a)); *Gunderson v. ADM Investor Servs., Inc.*, 230 F.3d 1363, 1363 (8th Cir. 2000) (same).

15

distinguishable circumstances and finds control unnecessary.[15] District courts, as

expected, are split on this issue as well.[16]

Given the unclear nature of the federal case law, the parties encourage us to

look at CFTC administrative case law to establish whether control is required to

prove agency by implied actual authority. The bulk of the CFTC case law

suggests that while control is relevant, it is not dispositive and courts should

assess agency based on a totality of the circumstances.[17] While we find these

cases, many of which are initial opinions issued by Administrative Law Judges

[15]*Dohmen-Ramirez v. CFTC*, 837 F.2d 847, 858 (9th Cir. 1988) (while appearing to address apparent rather than actual agency explicitly finding "[i]t is not necessary to show control to establish agency under the CEA").

[16]*Compare In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 531-32 (S.D.N.Y. 2008) (applying common law test based on a reading of *Rosenthal*); *CFTC v. Equity Fin. Group,* LLC, No. 04-1512, 2006 WL 3751911 at *9 (D.N.J. Dec. 18, 2006) (apply common law control based on reading of *Rosenthal*), *with CFTC v. Int'l Fin. Serv.*, 323 F. Supp. 2d 482, 499 n.12 (S.D.N.Y. 2007) (citing *Rosenthal* and referring to the totality of the circumstances); *CFTC v. Emerald Worldwide Holdings, Inc.*, No. 03-8339, 2005 U.S. Dist. LEXIS 42893 at *23 (C.D. Cal. April 19, 2005) (relying on CFTC cases and employing totality of the circumstances); *Aspacher v. Kretz*, No. 94 C 6741, 1997 U.S. Dist. LEXIS 8000 at *17-20 (N.D. Ill. June 3, 1997) (relying on *Rosenthal* and looking at the totality of the circumstances).

[17]*See Buckner v. Refco Inc.*, No. 00-R122, 2001 CFTC Lexis 53, at *3 n.7 (CFTC April 25, 2001) (noting in procedurally distinguishable circumstances CFTC has rejected idea that control is essential); *Webster,* 1999 CFTC Lexis 26, at *97 (finding that control is probative but not dispositive); *Reed v. Sage Group, Inc.*, CFTC Docket No. 85R-312, 1987 CFTC LEXIS 161 (CFTC Oct. 14, 1987) (finding agency depends upon totality of the circumstances and using language that indicates that control is not required); *Lobb v. J.T. McKerr & Co.*, CFTC Docket No. 85R-185, 1989 CFTC LEXIS 608, *23 (CFTC Dec. 14, 1989) (supporting totality test); *Bogard v. Abraham-Reitz & Co.*, CFTC Docket No. R 77-315, 1984 CFTC Lexis 332, *13 (CFTC July 5, 1984) (control is not dispositive); *but see Pacific Trading Group, Inc. v. Global Futures & Forex Ltd.*, CFTC Docket No. 02-R080, 2004 CFTC Lexis 151, *15 (CFTC Nov. 16, 2004) (citing two-prong test including control from the Restatement to define agency under 2(a)(1)(B)).

16

rather than final decisions issued by the CFTC Board itself, to be helpful, we find the history of vicarious liability in the commodities context to be more so.

Congress first used the current language of the CEA vicarious liability provision and CFTC vicarious liability regulation on September 21, 1922, when it enacted the Grain Futures Act ("GFA"), 67 P.L. 331, 42 Stat. 998 (1922). In section 2(a) of the GFA under a heading entitled, "[p]rincipals responsible for acts of agents," Congress included the language of the current provisions:

> The act, omission, or failure of any official, agent, or other person acting for any individual association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

Congress retained the language fourteen years later when it passed the CEA in order to expand its jurisdiction over commodities trading and introduce additional mechanisms to prevent fraud and manipulation. 74 P.L. 675, 49 Stat. 1491 (June 15, 1936). Congress reaffirmed the language again in 1974 when it passed the Commodities Futures Trading Act ("CFTA"), 93 P.L. 463, 88 Stat. 1389 (1974), establishing the CFTC and expanding the CEA to non-agricultural commodities. *Dunn v. CFTC*, 519 U.S. 465, 469 (1997). When Congress passed the CFTA it gave no indication that the CFTC should change the standard for

17

vicarious liability in any way or that there was a gap in which the agency needed to regulate. Therefore, on January 21, 1976, when the CFTC promulgated Regulation 1.2 containing the exact vicarious liability language of the original GFA and CEA, the CFTC adopted the meaning given to this language in those earlier statutes. This history indicates that Congress conceived of this language as a standard governing principals and agents, or a common law agency standard, and that Congress had not altered the conception despite the changes in commodities regulation. Nothing has changed with respect to vicarious liability in the commodities context since 1922. It appears clear to us that the vicarious liability statute and regulation codify common law principal agent liability.

Under the common law actual agency, either implied or express, requires: (1) consent to the agency by both principal and agent; and (2) the control of the agent by the principal. Restatement (Second) of Agency § 1 (1958); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003). The three-part test articulated by the district court relying on language in *Webster*, CFTC Docket No. 98-R0009, 1999 CFTC Lexis 26 at *97-98, uses "acquiescence" and "sufficient support" to address consent and requires control. Although we find

18

*Webster* itself to be very weak authority,[18] we find that the district court correctly articulated the test for common law agency, and thus for vicarious liability in the context of the CEA.

### B. District Court Did Not Commit Clear Error

We will examine the evidence in the record with respect to consent and control. As to consent, we note that FxCM went to great pains to disclaim any agency relationship with GMC. The Agreement between the parties contains multiple provisions specifically disclaiming any agency relationship, and many of the documents presented to GMC's clients, including the Limited Power of Attorney Form, the Notice to Trader Document, and the Trader Agreement, contain similar disclosures. FxCM's officers testified at trial that they employed counsel with an expertise in CFTC law to draft these documents for the specific purpose of ensuring they did not enter into an agency relationship. (DE 329 at 145, 196-97; DE 330 at 147-48). While "[e]xpress disclaimers of agency do not necessarily eliminate the existence of an agency relationship," *Carr v. Stillwaters Dev. Co., L.P.*, 83 F. Supp. 2d 1269, 1279 (11th Cir. 1999), the fact that FxCM

---

[18] *Webster* is an initial administrative law opinion written by an administrative law judge. *In re Three Eight Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,749 at 40,444 (CFTC June 16, 1993) ("As we have noted before, however, unless the reasoning of an initial decision is specifically adopted by the Commission, it does not represent Commission precedent. It is certainly not an appropriate basis for inferring limitations on reasoning included in a Commission decision.").

expended such considerable efforts to avoid an agency designation is palpable evidence that FxCM did not intend to consent or acquiesce to an agency relationship with GMC. Beyond the language of the documents, additional evidence supports a lack of consent or support. As the district court notes, FxCM shared no employees with GMC, split no commissions with GMC, and provided GMC with no meaningful market research or trade information. *See Stotler*, 855 F.2d at 1292-93 (finding agency based on fact that FCM's internal business records listed an associated person as a salesman, the company assigned him a salesman number, FCM gave him its own literature and forms to distribute to the people he solicited, FCM provided associated person with fifty percent commission on all trades, and FCM permitted him to place trades directly through the clerks on the floors of the commodities exchange like the FCM's brokers would); *Rosenthal*, 802 F.2d at 967-68 (finding it relevant FCM designated an associated person as a branch manager, leased office space to him, described the associated person as a "salesperson," and split commissions with him); *Reed*, No. 85R-312, 1987 CFTC Lexis 161 at *25-28 (finding agency where FCM provided all documents to open customer accounts and research and trading information for customers). GMC did agree to send its customers exclusively to FxCM. Such an exclusivity agreement is often indicative of agency. *See CFTC v. Millenium*

*Trading Group, Inc.*, No. 07-CV-11626, 2007 U.S. Dist. Lexis 65784 at *11-12

(E.D. Mich. Sept. 6, 2007) (relying on the fact that broker introduced at least

twenty-five customers to FCM exclusively); *Reed*, No. 85R-312, 1987 CFTC

Lexis 161 at *26-27 (stating fact that broker did essentially all business through

FCM raised doubts as to whether they were independent business entities).  Here,

however, this exclusivity is just one factor among many, and without more, we

cannot find that it exclusively establishes agency.  The district court's conclusion

that FxCM did not consent to a relationship with GMC is certainly plausible in

light of the record as a whole.[19]

    As to control, it is undisputed that FxCM played no role in hiring, training,

supervising, or disciplining GMC's employees.  *See Millenium Trading Group,*

*Inc.*, No. 07-CV-11626, 2007 U.S. Dist. Lexis 65784 at *11-12 (finding agency

where agent agreed to notify FCM, in writing, of any customer complaints, or

pending or threatened actions, investigation, lawsuit, or proceeding instituted by

any customer, regulatory agency, exchange, or board of trade and agreed to

cooperate with FCM by furnishing all documents necessary to conduct an

investigation and defend a claim involving it); *Reed*, No. 85R-312, 1987 CFTC

---

[19]Although we find the factual analysis in *Reed* and *Millenium* to be useful for the purpose of analyzing the facts here, we note that both cases wrongly employed a totality of the circumstances approach rather than the common law test for agency.

Lexis 161 at *26-27 (finding agency where agent was required to comply with all present and future policies of FCM, to refrain from making any statement inconsistent with FCM's account-related documents, to report all complaints received to FCM and aid FCM in investigating them, to collect on margin calls issued by FCM, and to indemnify FCM for all claims arising from introduced accounts). Further, there is no evidence that FxCM supervised or controlled GMC's trading strategies or had a right to inspect GMC's books and records. *See Reed*, No.85R-312, 1987 CFTC Lexis 161 at *26-27 (finding agency where FCM had the power to obtain documents relating to agent, the general power to inspect and audit all of its books, records, and facilities, and the power to review logs of conversations between it and its customers). It is clear that FxCM had the power to mandate that GMC send certain materials to its prospective employees, that FxCM had the right to inquire as to GMC's business practices, and that GMC solicited all its customers based upon criteria established by FxCM. *See Millenium*, No. 07-CV-11626, 2007 U.S. Lexis 65784 at *11-12 (finding fact that FCM set customer criteria significant). These facts without more, however, are not indicative of control. The district court's conclusion that FxCM did not control GMC is certainly plausible in light of the record as a whole.

## III. Conclusion

For the reasons set forth above, we AFFIRM the district court's judgment in favor of FxCM and hold that under either 7 U.S.C. § 2(a)(1)(B) or 17 C.F.R. 1.2 the test for vicarious liability is common law agency and the district court did not commit clear error in finding under this test that GMC was not acting as FxCM's agent when it violated the CEA.